# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **B.V., M.V., and A.V.**

**No. 20-0582** (Roane County 19-JA-56, 19-JA-57, and 19-JA-58)

**FILED**

**December 10, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Mother J.V., by counsel Betty Clark Gregory, appeals the Circuit Court of Roane County's April 20, 2020, order terminating her parental rights to B.V., M.V., and A.V.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Leslie L. Maze, filed a response on the children's behalf in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights without first providing her with an improvement period.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In September of 2019, the DHHR filed a child abuse and neglect petition alleging that M.V. disclosed that her father had sexually abused her on multiple instances and that petitioner witnessed the most recent instance of abuse but failed to report the father to law enforcement. The DHHR alleged that petitioner denied any knowledge that M.V. was abused in Roane County, but noted that the family was investigated while they were living in Ohio. In the West Virginia case, M.V. participated in a forensic interview and confirmed that petitioner observed that the father was touching M.V. inappropriately through a window of the home. M.V. stated that petitioner and the father got into a fight afterwards. She also disclosed that the father would make her walk around the house naked while petitioner worked and would touch her inside and outside of her vagina. The DHHR further alleged that petitioner and the father subjected the children to emotional trauma

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

and mental abuse by engaging in an incestuous relationship. Petitioner is the biological niece of the children's father, and the father admitted to engaging in a continuing sexual relationship with her in violation of West Virginia law.

In November of 2019, petitioner stipulated to allegations contained in the petition that her incestuous relationship with the father affected the mental and emotional health of the children and that the father sexually abused M.V. Upon finding that petitioner acknowledged and understood her right to a contested adjudicatory hearing and had indicated a desire to waive the same, the circuit court adjudicated the children as abused children and petitioner as an abusing parent. Thereafter, petitioner moved for a post-adjudicatory improvement period.

The circuit court held dispositional hearings in January, February, and March of 2020 and heard evidence regarding petitioner's motion for a post-adjudicatory improvement period. The therapist for B.V., M.V., and petitioner testified and the circuit court made the following findings: the therapist had been treating the children since June of 2018, and petitioner "sporadically" for the last two years, but weekly since September of 2019, when the children were removed; the therapist initially treated petitioner for depression. However, after the children were removed, she treated petitioner for her past emotional and sexual abuse. The therapist testified that, after the children were removed, petitioner disclosed for the first time that her relationship with the father began when she was seventeen years old and that she had been sexually abused when she was four and six years old, and once as an adult by other members of her immediate and extended family. The therapist opined that petitioner displayed many symptoms of post-traumatic stress disorder ("PTSD"), which she "attributed to both the sexual abuse and the removal of the children." The therapist believed petitioner was "extremely functional," was "very motivated to learn," "progressed in therapy," and could recognize the pattern of abuse she endured over her lifetime. Further, the therapist disagreed with the conclusions of petitioner's forensic psychological evaluation as more thoroughly addressed below, because petitioner submitted to the evaluation soon after the children were removed and prior to consistent therapy.

Petitioner testified that the father began sexually abusing her at age fifteen. She also testified that she experienced a long history of sexual abuse by her brother and two cousins, one of which was the father's son. Petitioner testified that she first learned of M.V.'s disclosure of sexual abuse during the child abuse and neglect investigation. She stated that she immediately believed M.V. and denied prior knowledge of abuse; in retrospect, petitioner acknowledged signs of sexual abuse that she missed, such as the father providing M.V. with expensive gifts and giving her more leeway than her brothers. Petitioner recalled an incident wherein she observed the father laying on the porch swing with M.V. at his feet. During the incident, the father was wearing "very loose shorts and no underwear." Petitioner testified that she told the father that his conduct was inappropriate and told him "not to sit like that with [M.V.]." Petitioner acknowledged that "she had taken the children around the individuals who had sexually abused her as a child, but denied that the children were ever alone with these individuals." She also testified that she went to family functions, where her past abusers were present, because she "was expected to be there." Petitioner testified that she did not recognize her incestuous relationship with the father was wrong because of the sexual abuse she suffered as a child.

Next, a Child Protective Services ("CPS") worker testified that the children had been placed separately due to their special needs and sexualized behaviors. Petitioner and M.V. engaged in one therapy phone call in January of 2020, "after which [M.V.] stated she did not want to talk to [petitioner]." According to the worker, B.V. wanted continued contact with petitioner and engaged in regular phone calls. A.V.'s therapist did not recommend visitation with petitioner.

Finally, petitioner's forensic psychological examiner testified regarding a parenting evaluation that petitioner had undergone in September of 2019. The examiner testified that she did not believe that petitioner was truthful during the evaluation based upon the DHHR's records and petitioner's statements to CPS workers. During the evaluation, petitioner never acknowledged the risk that the father posed to the children. The evaluator observed no symptoms of PTSD during the evaluation or testing. The evaluator testified that petitioner did not indicate that she was traumatized by her relationship with the father and that she described the relationship as normal and healthy until the father began sexually abusing M.V. Due to petitioner rating her parenting stress related to M.V. as higher than the stress related to her other children, the evaluator was concerned that petitioner blamed M.V. for losing her security with the father. The evaluator found petitioner to be "very dependent and heavily reliant upon someone to care for her and look out for her," so much so that she would be "submissive to that person and subvert[] her will and desires to the desires of that other person in exchange for safety." Ultimately, the evaluator opined that petitioner would always be vulnerable to victimization due to her past sexual abuse and her desire for safety. The evaluator did not recommend supervised visitation between petitioner and the children because children who are sexually abused and whose parents do not believe them "have the worst psychological and emotional prognosis of all sexually abused individuals." Finally, the evaluator opined that it would not be beneficial to reevaluate petitioner after her recent therapy, and that a determination as to whether petitioner could be a protective parent could likely not be established after a six-month improvement period.

The circuit court stated that its primary concern was whether petitioner "fully recognize[d] the extent of the sexual abuse she and [M.V. had] suffered and whether she can break the abuse cycle . . . in order to protect her children." However, it found that a determination could not "be made during the term of an improvement period or even an extension thereof." The court further found that "[g]oing forward with an improvement period may well place [M.V.] in the same position as [petitioner] in the future years." Finally, the circuit court considered that "[a]n improvement period can only be granted when there is a reasonable likelihood that the [a]dult [r]espondent can correct the conditions which led to the abuse and neglect during the term of an improvement period." Ultimately, the circuit court concluded that there was no reasonable likelihood that petitioner could demonstrate during the term of an improvement period that she "possesses the ability to protect her children from future abuse, given her own vulnerability to victimization and tendency to blame [M.V.] for the disruption of her security and safety." As a result, the circuit court reasoned that the potential for future abuse was so great as to preclude the use of resources to attempt to mitigate it. Accordingly, the circuit court denied petitioner's motion

for a post-adjudicatory improvement period and terminated her parental rights by its April 20, 2020 order, which petitioner now appeals.[2]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that a mother who has been the victim of severe sexual abuse of many years should not have her parental rights terminated without first being granted an improvement period. She asserts that she was willing and able to cooperate with a family case plan and that she proved the same through her testimony and participation in therapy. Further, petitioner avers that "there is nothing in the record to indicate that [she] was aware of anything more than the one episode of inappropriate behavior." We find petitioner's argument to be without merit.

West Virginia Code § 49-4-610(2)(B) provides that a circuit court may grant a parent a post-adjudicatory improvement period when she "demonstrates, by clear and convincing evidence, that [she] is likely to fully participate in the improvement period." It is well established that "West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period." *In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015). Additionally, West Virginia Code § 49-4-604(c)(6) provides that a circuit court may terminate a parent's parental rights upon finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination of parental rights is necessary for the welfare of the children. Pursuant to West Virginia Code § 49-4-604(d)(5), a circuit court may determine that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected when

---

[2]The father voluntarily relinquished his parental rights to the children. According to the parties, the children have been separated. A.V.'s permanency plan is adoption in his current foster placement. Seventeen-year-old B.V.'s permanency plan is independent living. Due to behavioral issues, M.V. is currently undergoing residential treatment, but her permanency plan is adoption by a foster family.

[t]he abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child.

Finally, "if a parent is unable to demonstrate an ability to correct the underlying conditions of abuse and/or neglect in the near future, termination of parental rights may proceed without the utilization of an improvement period." *In re Charity H.*, 215 W. Va. 208, 216, 599 S.E.2d 631, 639 (2004).

Here, the circuit court properly found that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future. Petitioner repeatedly emotionally injured the children through her illegal, incestuous relationship with the father, which had been normalized through her behavior. Petitioner did not recognize the risk that the father posed to the children, despite the fact that the father sexually abused her while she was underage. Furthermore, according to M.V. petitioner witnessed an incident where the father was sexually abusing the child, yet petitioner failed to report the father's behavior to law enforcement. The record reflects expert witness testimony that petitioner blamed M.V. for the loss of her security with the father as a result of the sexual abuse allegations. Importantly, M.V. refused to visit with petitioner during the underlying proceedings, and the expert opined that visitation would not be in the child's best interest due to petitioner's reluctance to act after witnessing the father sexually abusing the child. It is clear that reunification between petitioner and the children would cause a great degree of family stress. On appeal, petitioner emphasizes testimony from her therapist that she made improvement since the initiation of the proceedings. However, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997). The circuit court heard the evidence and relied on the testimony of petitioner's forensic evaluator to conclude that petitioner would be unable to demonstrate an ability to safely parent the children during an improvement period or extension thereof. Upon our review, we find no error in the circuit court's determination that there was no reasonable likelihood that the conditions of neglect or abuse could be substantially corrected in the near future.

Accordingly, it was not necessary for the circuit court to grant petitioner an improvement period prior to terminating her parental rights. We have held that

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

5

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). The circuit court's finding, which is fully supported by the record, precludes the imposition of any less-restrictive dispositional alternatives, such as the granting of an improvement period.

 For the foregoing reasons, we find no error in the decision of the circuit court, and its April 20, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**:  December 10, 2020


**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison